[S. F. No. 1041.   In Bank.—December 20, 1898.]

SAN .FRANCISCO SAVINGS UNION, Respondent, v. E. B. LONG et al., Appellant.   GUY SHOUP et al., Respondents.

INTERPLEADER — CONFLICTING CLAIMS — INTERLOCUTORY DECREE — PLEADING — ANSWER — CROSS-COMPLAINT.— In an action of interpleader, to compel the defendants to litigate their conflicting claims to a fund held by the plaintiff, the right of the plaintiff to bring the action should first be determined; and if such right is sustained, an interlocutory decree should be entered requiring the defendants to interplead, and litigate their claims to the fund *inter esse.* The answer of each defendant to the bill of interpleader setting forth his claims is in the nature of a cross-complaint, and should be served upon the other defendants, who may answer the same.

ID.— ACTION BY SAVINGS BANK — TERM DEPOSIT — WAIVER OF OBJECTION — CONSENT TO INTERPLEAD.— In an action by a savings bank to determine the conflicting claims of the beneficiaries and members of

a benefit life association which had ceased to do business, and to which a certificate of term deposit had been given, if none of the defendants object to the right of the plaintiff to bring the action, and if they make up their pleadings and litigate their ·claims to the fund, without objection to an interlocutory decree discharging the plaintiff upon his deposit of the fund in court, and requiring them to interplead, they must be held to have consented to such decree, and to have released the plaintiff from his contract obligation, and to have given to plaintiff the position of a mere stakeholder.

Benefit Life Association — Insolvency — Disposition of Reserve Fund.—Upon the insolvency of a benefit life association organized upon the assessment plan, the reserve fund of five thousand dollars required by the act of 1891 (Stats. 1891, p. 126) to be held and deposited in trust for the contract holders of the corporation, is designed as an emergency fund to be used only in case of the insolvency of the corporation, and cannot be used to pay the benefits due from the corporation while solvent, nor is it subject to any liens in favor of policy-holders, nor to execution for any debts of the corporation. It must be distributed pro rata among the beneficiaries for whose benefit the policies were issued; and neither the members of the association per capita nor its general creditors can share in the distribution.

Id.—Diversion of Fund—Obligation of Contracts—Presumption.—Any diversion of the reserve fund which is held in trust for contract holders, so as to pay therewith benefits due from the corporation while solvent, instead of resorting to assessments, would impair the obligation of contracts, which the legislature cannot be presumed to have intended.

Authority of Attorney — Presumption — Power of Court.—It is to be presumed until the contrary appears that an attorney is duly authorized to appear and represent any parties for whom he assumes to act; yet the court can always require evidence of his authorization, and may correct mistakes and rectify any unauthorized appearance.

APPEALS from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. J. M. Seawell, Judge.

The facts are stated in the opinion of the Court.

Dorn & Dorn, for E. B. Long, S. M. Gower et al., Appellants.

Charles S. Peery, for Home Benefit Life Association, Appellant.

Theodore Savage, for S. Meisel, Appellant.

T. C. Spelling, for Sophie Koneke, Appellant.

Fred H. Hood, for W. J. Collingham et al., Appellants.

Byron Waters, for Amy Bernhard, Appellant.

Lane & Lane, for R. A. Redman, Appellant.

H. C. Campbell, for San Francisco Savings Union, Respondent.

Van Ness & Redman, for J. T. Loomis, Respondent.

Hillyer & Jacobs, for Guy Shoup, Respondent.

Guy Shoup, Respondent in *pro. per.*

TEMPLE, J.—This is an action of interpleader brought by the plaintiff, a savings bank, to have sundry claimants to a deposit in the bank litigate among themselves and have determined to whom the money should be paid. In such cases there may always be a twofold contest: First, as to the right of the plaintiff to bring the suit and to force the defendants to interplead; and, if such right is maintained, the litigation among the defendants. There may be two sets of pleadings: first, those having reference only to the right of the plaintiff to compel the defendants to interplead, and the several complaints of the defendants in which their respective rights to the subject in controversy are set up. These may be, and usually are, included in the answer to the bill of interpleader. Such answer is then in the nature of a cross-complaint, and should be served upon each defendant, who may answer the same. Whether the plaintiff shall be permitted to maintain such an action is first determined, and, if his right is sustained, an interlocutory decree is entered, requiring the defendants to litigate their claims *inter sese.*

In this case no defendant in his pleadings took issue with the plaintiff as to its right to compel the parties to interplead. Some allegations of fact were controverted because not sufficiently favorable to some special defendant. But those who appeared set out their respective rights as against the others, and upon this state of facts the interlocutory decree was entered, and the plaintiff, having deposited the money in court, was dismissed.

from the case. Now certain defendants object that a proper case, showing the right of plaintiff to compel the defendants to interplead, is not stated in the complaint, and that it was error to allow the plaintiff to pay the money into court and thereupon to be dismissed from the case; and it is contended that to dismiss the plaintiff from the case works a discontinuance of the action. The complaint shows that "conflicting claims" are made with reference to the deposit, and there can be no doubt of the right of plaintiff to maintain an action, under section 386 of the Code of Civil Procedure, to have them determined. The bank was not, however, a mere stakeholder. It was a party to a contract, which is shown by the certificate issued by it, by the statutes relating to such corporations and by its by-laws and rules. The certificate was on its face payable "at the expiration of a term of not less than six months from the time that notice of demand of payment thereof shall have been given to said corporation in writing at its office." Of course, the plaintiff could not aver that any such notice or demand had been made by the owner of the certificate, for it averred that it was unable to determine such ownership. But when, as here, all parties come in, and, without objection, make up their pleadings and litigate their claims, we feel warranted in holding that all consent to the remedy sought, and to the payment into court and consequent dismissal as to plaintiff. They have consented to release plaintiff from the further performance of his contract and have given him the position of a mere stakeholder.

The controversy is between beneficiaries and members of the defendant corporation, the Home Benefit Life Association, which was organized in 1880, and until 1894 was continuously engaged in a life insurance business upon the assessment plan. In 1891, at which time the corporation had a great many members and numerous contracts or policies outstanding, an act was passed by the legislature entitled, "An act relating to life, health, accident, and annuity or endowment insurance on the assessment plan and the conduct of the business of insurance" (Stats. 1891, p. 126), which contained the following provisions:

"Sec. 2. Corporations may be formed under the general laws of this state to carry on the business of mutual insurance upon the assessment plan, and shall be subject only to the provisions of

this act. No such corporation shall issue contracts of insurance until at least two hundred (200) persons have applied, in writing, for membership or insurance therein, and have paid the treasurer of such corporation the sum of five thousand (5,000) dollars. This sum shall be invested in bonds or securities, approved by the insurance commissioner of this state, or deposited in some bank in this state where it will earn interest. Said bonds or securities, or evidences of such deposit, shall be placed, through the insurance commissioner of this state, with the state treasurer, and the principal sum shall be held in trust for the contract holders of such corporation, with the right in the corporation to exchange such bonds, securities, or evidence of bank deposit for others of like value. Such corporation shall also, as a condition precedent to issuing any contracts of insurance, obtain the written certificate of the insurance commissioner that it has complied with the requirements of this act; and that the name of the corporation is not the same as that of any other corporation of this or other states, as indicated by the insurance department reports in his office; nor shall the commissioner approve any name or title so closely resembling another as to mislead the public. No corporation formed hereunder shall have legal existence after one year from the date of its articles, unless its organization has been completed and business commenced; nor shall any corporation or individual solicit, or cause to be solicited, any business, until such corporation shall have complied with the provisions of section 663 of the Political Code of this state.

"Sec. 3. Any existing corporation engaged in transacting the business of life, health, accident, or endowment insurance, on the assessment plan, may reincorporate under the provisions of the Civil Code of this state, and under the provisions of this act; provided, that it shall not be obligatory upon such corporation to reincorporate; and any such existing corporation may continue to exercise all rights, powers, and privileges conferred by this act, the same as if incorporated hereunder."

· In section 4 it is provided that the amounts specified in the contracts (policies) shall be paid as therein named, "and such indebtedness shall be a lien upon all the property of such corporation with priority over all indebtedness thereafter incurred, except as hereinafter provided in case of insolvency." Further-

more, a failure to make such payment within thirty days after notice provided would constitute a forfeiture of the right to do business.

In section 5 the corporation is required, within one year after the passage of the act, to create an emergency or reserve fund, not less than the largest benefit contracted to be paid, to be invested as directed in section 2. When the corporation should discontinue business this fund was to be returned to the corporation, or disposed of "as may be determined by the superior court of the county."

The act contains no provision in regard to the insolvency of the corporation, but in section 10 a procedure is provided for revoking its authority to do business, when it is carrying on a fraudulent or unlawful business, is not carrying out "its terms of contract," or cannot within three months from the notice of default pay its obligations.

Pursuant to the act the corporation on March 15, 1892, deposited with plaintiff five thousand dollars, and took a special certificate of deposit, and caused the same, through the insurance commissioner, to be placed in the state treasury, and plaintiff was immediately notified of the assignment to the state treasury.

In September, 1894, the corporation defendant ceased to do business, being then indebted to the beneficiaries of deceased members in the sum of fifty-five thousand dollars, and having more than one hundred living members. Many suits were then pending against it, and some judgments had been obtained, and each sought to establish his right to the fund, which was about all the property the association had.

This action was then brought against about one hundred and twenty-five defendants, including the insurance association, the insurance commissioner and the state treasurer.

Answers and cross-complaints were put in by some of the defendants. Mr. Spelling appeared and answered for a great number of them. Other attorneys subseqeuntly appeared and answered for some of these defendants without having been substituted. As to Mrs. Mills and the defendant corporation, it is now contended on the part of Meisel and Gower, who were at the time also clients of Spelling, that they were not represented at the trial. Of course, this involves the proposition that Spelling

was not authorized to appear as their attorney.    It is now practically admitted that Meisel is but a representative of Mrs. Koneke, who is still represented by Spelling; and Gower, so far as the conduct of the case is concerned, seems also in accord, although having an apparently adverse claim.

It is always presumed, until the contrary appears, that an attorney is duly authorized to appear for and represent any parties for whom he assumes to act.    This confidence, which underlies all judicial action in this country, rests not only upon a belief in the honor and integrity of the attorney, but upon the fact that he is a sworn officer of the court.    There can scarcely be a more gross violation of the duty of an attorney than knowingly and willfully to appear for and represent a party to an action without authority.    And it is especially so if the person for whom the unauthorized appearance is made has not been served and does not know that an attempt is being made to obtain a judgment against him.    In this case we are satisfied that the unauthorized appearance was unintentional, and, as we are assured, resulted from a mistake made in copying and filling out the rough draft of the answer.    I think the judgment must be reversed on other grounds, and it is not necessary to pursue this matter further. Although the authority of an attorney is taken for granted, yet the court can always require evidence of his authorization, and in the trial court these matters may all be put right.

The insurance association on May 1, 1886, issued to one Samuel T. Murrey a certificate of membership by which, conditioned upon previous performance on the part of the member, it contracted to pay at his death six thousand dollars to Mrs. Murrey.    Murrey died September 29, 1886, and in 1888 Mrs. Murrey commenced an action against the corporation on the contract of insurance.    Mrs. Murrey, then Mrs. Mills, recovered judgment May 17, 1892, for eight thousand two hundred and fifty-five dollars and eight cents.    An appeal was taken to this court, and W. H. Chickering and F. C. Havens were sureties on the appeal bond.    The judgment was affirmed on appeal December 26, 1894. After the remittitur was sent down the judgment was paid, four thousand three hundred and ten dollars and ten cents being paid by the sureties.    October 8, 1896, Chickering and Havens as-

signed to one Shoup all their right and title to the judgment and their claim and lien upon the assets of the corporation.

Neither Shoup, Chickering, nor Havens was made a defendant in the original complaint, nor does the record here show how Shoup became a party defendant, or was entitled to file a cross-complaint, or to be heard in regard to the disposition of the fund. The court found, however, that Mrs. Mills "acquired a lien, securing her claim arising as aforesaid, upon the money paid into court by the plaintiff immediately upon its deposit with the plaintiff by said Home Benefit Life Association," et cetera. The fund, to the extent of four thousand three hundred and ten dollars and ten cents, with interest from the date of payment by Chickering and Havens, was awarded to Shoup. The residue was given to Mrs. Koneke.

Mrs. Koneke recovered a judgment against the association March 23, 1896, establishing and foreclosing a lien upon the money in bank and upon the certificate of deposit. Under this decree a receiver was appointed to take and sell the property, and the certificate of deposit was actually delivered to the receiver, and such receiver then, under the order of the court, assigned and delivered the certificate to Mrs. Koneke, upon condition that she would credit the full amount due upon the certificate upon her judgment. This was done; but subsequently, by some means the receiver again came into possession of the certificate, and formally sold it as personal property is sold under execution, and appellant Meisel became the purchaser. Both Koneke and Meisel now claim the entire fund, and each has appealed from the judgment. Meisel and Gower also appeal from the order refusing a new trial.

Quite a number of appellants were members of the corporation at the time it suspended business. They contend that the fund was solely for the benefit of members and not for the creditors, and therefore could not be subject to a lien for debts or to execution for the debts of the corporation.

Many appellants are beneficiaries of deceased members. The aggregate amount of such claims is about fifty-five thousand dollars. They contend that the fund was for the benefit of such creditors, but not subject to execution or to the lien provided

in section 4, but in case the corporation became insolvent it was to be disposed of by the court to the beneficiaries of the fund. They contend for a *pro rata* division among the creditors.

It is claimed that Gower has a lien second only to that of Mrs. Koneke.

Shoup, of course, contends that his assignors were subrogated to the rights of Mrs. Mills, when, as sureties upon the appeal taken by the corporation, they were compelled to pay a portion of Mrs. Mills' judgment against the corporation. Their right to be thus subrogated is strenuously resisted.

But under the view I take of the matter it is not necessary to determine the very many difficult and much argued points involved in the contention in regard to priority of the Mills and the Koneke claimants, for in my judgment neither has any claim to priority over the other or over other beneficiaries.

Included in the act are health, accident, annuity, and endowment companies, as well as life insurance. In all except life insurance the corporation contracts in certain events to pay money to living contract holders, or members. The statute does not otherwise designate the purpose for which the fund is designed, than that it "shall be held in trust for the contract holders of such corporation, with the right in the corporation to exchange such bonds, securities, or evidence of bank deposits for other of like value." No mode is provided by which the fund can be subjected to the payment of any demands of the contract holders, nor is there a mode for replenishing the fund when it has once been depleted. In all the corporations which come within the purview of the act a fund is provided for the payment of benefits, annuities or insurances; that provided in the life insurance companies being, as the terms of the act indicate, by assessments upon the surviving members. Since, therefore, the special fund provided was to be held by the state treasurer for the benefit of contract holders, and no provision was made for a resort to it in any event, and no mode provided for keeping it up, it is to be presumed that it was not to be resorted to under ordinary circumstances by those whose claims are made payable only out of other specified funds. For this reason it was placed out of the reach of the officers of the corporation. It was set apart for a specific purpose and taken out of the available assets of the corporation.

In section 5 of the act the corporation is required to accumulate an emergency or reserve fund "not less than the largest benefit contracted to be paid any one person." It must be invested as directed in section 2, and the fund there provided may be added to and made part of the emergency or reserve fund. Of course, under this permit it always would be made a part of the last-named fund, and when the largest benefit does not exceed five thousand dollars there would be no other fund. The statute does not state for what emergency this fund is provided, nor does it provide a mode by which it can be used, except that when the corporation shall discontinue business this fund shall be returned to such corporation, or so disposed of as may be determined by the superior court of the county.

It is evident that this fund which might, and therefore would, include the fund provided for in section 2, was provided solely for the emergency arising when the corporation should cease to do business. This express provision as to the mode in which it could be made available negatives all claim that there was any other.

Of course, the lien provided for in section 4 could not extend to it, notwithstanding the very general language of that section. In case of insolvency, by the very terms of the statute, the priority of the lien claimants should cease. If the corporation was not insolvent there could be no occasion for the enforcement of a lien, for by the terms of the contract the beneficiary was to be paid by the assessment to be levied upon the death of a member. The failure of the corporation to pay, as provided by section 4, must be the insolvency provided for, as it is also the occasion upon which the funds can be resorted to as provided in section 5.

As to existing corporations and contracts it may well be doubted whether the legislature could provide such a fund for the payment of benefits in a going concern. The scheme is the reverse of the tontine system. The contract holder first to die will have paid no death assessment. The one who survives to the last will pay many assessments. If the fund could be reached by the first beneficiary, contract holders will be forced to contribute contrary to the terms of their contracts. Whether the legislature could require the creation of a reserve fund to be available in case of insolvency is a different question. But if it

can be used to pay benefits due from the corporation while solvent, instead of resorting to assessment, it impairs the obligation of contracts between the members and the corporation.

It is not to be presumed that the legislature intended to do this.

It is said that in the case of *Kruger v. Life etc. Assn.*, 106 Cal. 98, this court held that the lien of such a claim did extend to this fund. The only appellant there was the state treasurer, who insisted that the suit was in effect an action against the state and could not be maintained. Other points were not maturely considered. The court says that it does not there appear that there were other contract holders—that is, that there were other beneficiaries. If there were no other beneficiaries and the corporation had ceased to do business, why should plaintiff not have the money—as directed by the superior court? It was not necessary in such a case to establish a lien.

I think no lien was created upon this fund. It was placed in the state treasury, subject to be disposed of only by the superior court upon the happening of the emergency provided for, to wit, when the corporation should cease to do business. If, when it ceased to do business, there were no outstanding liabilities the fund would be returned to the corporation.

If these views are correct, it must follow that Mrs. Mills had no lien upon the fund to which the assignors of Shoup could be subrogated. It also must follow that Koneke had no lien to foreclose. Her judgment would, however, not having been appealed from, be conclusive of her rights so far as the corporation was concerned. Does it bind also the beneficiaries of deceased members? A judgment against a going corporation necessarily concludes everyone, as to the property of the corporation, so far as the property can be reached by ordinary process. But when the corporation has ceased to do business, and the proceeding is to appropriate funds which are for the security of creditors only in case of insolvency, it is a different matter. The corporation, as such, has no interest in the question as to which creditor shall have the fund. The creditors have several interests and must be brought in. Koneke's judgment establishing her lien does not, therefore, bind the other beneficiaries. The state treasurer could assert the existence of

their claims and ask that they be brought in for his protection, but he cannot represent them in a suit to dispose of the fund.

There is nothing in the contracts appearing here nor in the rules and by-laws of the association providing for any payments in any event by the corporation to the living contract holders. To divide the fund among the members *per capita* would not be to apply it for their benefit as contract holders. The fund must be for the purpose of securing, wholly or partially, in some event, the performance of their contracts by the corporation. In the case of endowments or annuities it would then be divided among living contract holders. In this case it must go to their beneficiaries. They are the persons for whose benefit the contracts were made.

Although the fund here is created in quite another mode, yet the rights of the claimants to an equal or *pro rata* distribution of it are precisely like those of the creditors in the case of *Winchester v. Mabury*, 122 Cal. 522. There being no provision giving any creditor priority or preference, it should be divided in proportion to their respective claims. The general creditors, of course, cannot share in the division, the fund being for policy holders only.

The judgment is reversed and the cause remanded for a new trial in accordance with this opinion. If all the necessary parties are not before the court they should be brought in.

Henshaw, J., McFarland, J., Harrison, J., and Garoutte, J., concurred.

Rehearing denied.